**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

**2024 MSPB 14**

Docket No. DA-0432-19-0539-I-1

**Latisha A. Zepeda,**

**Appellant,**

v.

**Nuclear Regulatory Commission,**

**Agency.**

October 30, 2024

Kevin C. Crayon Jr., Esquire, Kennesaw, Georgia, for the appellant.

Michael Gartman, Esquire, and Vinh Hoang, Esquire, Rockville, Maryland, for the agency.

**BEFORE**

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman
Henry J. Kerner, Member

**OPINION AND ORDER**

¶1    The agency has filed a petition for review and the appellant has filed a cross petition for review of the initial decision, which reversed the appellant's performance-based removal but denied her affirmative defenses. For the reasons discussed below, we DENY the petition for review and the cross petition for review. Except as expressly MODIFIED to incorporate the appropriate analytical framework for the appellant's disability discrimination claim, we AFFIRM the initial decision.

BACKGROUND

¶2        The following facts, as further detailed in the initial decision, are not disputed.    The appellant has a lengthy history of Federal employment, most recently as a Special Agent for the agency's Office of Investigations.    Initial Appeal File (IAF), Tab 1 at 1, Tab 28 at 4, Tab 51, Initial Decision (ID) at 3.  In that position, her permanent first-line supervisor was the Special Agent in Charge (SAIC).  IAF, Tab 28 at 4; ID at 3.  However, an Acting SAIC supervised the appellant from March to June 2018.  IAF, Tab 28 at 4; ID at 4.  During that period, the agency issued a performance improvement requirements memorandum (PIRM), which placed the appellant under a performance improvement period (PIP) based on unacceptable performance in three critical elements:  (1) planning and preparation for assigned investigations; (2) conduct of investigations/assists to staff; and (3) preparation of reports of investigation and assists to staff closure memoranda.  IAF, Tab 19 at 35-46; ID at 4.  Upon expiration of the PIP, the agency proposed the appellant's removal for unacceptable performance in the same three critical elements.  IAF, Tab 15 at 79-85; ID at 4.  After the appellant responded to the proposal, the deciding official sustained her removal, effective October 2018.  IAF, Tab 18 at 4-12; ID at 4-5.

¶3        The appellant unsuccessfully challenged her removal in a formal equal employment opportunity (EEO) complaint with the agency.  IAF, Tab 5 at 6-32; ID at 5 n.5.  Upon receipt of the final agency decision, she filed the instant appeal to challenge her performance-based removal and raise several affirmative defenses.  IAF, Tab 1 at 1, Tab 5 at 6.

¶4        The administrative judge developed the record and held a 2-day hearing before reversing the appellant's removal based on the agency's failure to prove that its performance standards were valid.  ID at 3, 8-12.  The administrative judge also considered but rejected the appellant's claims of a due process violation, ID at 5-7; discrimination based on race, sex, and national origin, along

with associated EEO reprisal, ID at 12-21; and disability discrimination, ID at 22-26.

¶5    The agency has filed a petition for review. Petition for Review (PFR) File, Tab 1. The appellant has filed a response, PFR File, Tab 3, and the agency has replied, PFR File, Tab 5. The appellant has also filed a cross petition for review, PFR File, Tab 3, to which the agency has responded, PFR File, Tab 6.

## ANALYSIS

### The agency failed to prove that its performance standards were valid.

¶6    At the time the initial decision was issued, the Board's case law stated that, to prevail in an appeal of a performance-based removal under chapter 43, the agency must establish the following by substantial evidence:[1]  (1) the Office of Personnel Management (OPM) approved its performance appraisal system and any significant changes thereto; (2) the agency communicated to the appellant the performance standards and critical elements of her position; (3) the appellant's performance standards were valid under 5 U.S.C. § 4302(b)(1); (4) the agency warned the appellant of the inadequacies of her performance during the appraisal period and gave her a reasonable opportunity to demonstrate acceptable performance; and (5) the appellant's performance remained unacceptable in one or more of the critical elements for which she was provided an opportunity to

---

[1] Substantial evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. 5 C.F.R. § 1201.4(p).

demonstrate acceptable performance.[2] *Lee v. Environmental Protection Agency*, 115 M.S.P.R. 533, ¶ 5 (2010). The administrative judge applied this standard and found that the agency proved the first two elements, ID at 7-8, but failed to prove the third—the validity of its performance standards, ID at 8-12. Therefore, the administrative judge reversed the appellant's removal without addressing the remaining elements. Since that third element is the crux of the arguments on review, our analysis will be similarly focused.

> *The performance standards in the appellant's performance plan were invalid.*

¶7      Under certain performance appraisal systems, including the one at issue in this appeal, performance of a critical element may fall between "fully successful" and "unacceptable." *Jackson-Francis v. Office of Government Ethics*, 103 M.S.P.R. 183, ¶ 6 (2006). However, performance falling between those levels, e.g., "minimally successful" performance, would not support removal under chapter 43; only "unacceptable" performance is actionable under the statute. *Id.*, ¶¶ 6-7. Performance standards are not valid if they do not set forth the minimum level of performance that an employee must achieve to avoid removal for unacceptable performance under chapter 43. *Id.*, ¶ 8. Absent valid performance standards, the Board cannot consider charged performance deficiencies. *Id.*

¶8      As the administrative judge noted, the appellant's performance plan included a five-tier rating system that consisted of unacceptable, minimally

---

[2] During the pendency of the petition for review in this case, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held in *Santos v. National Aeronautics and Space Administration*, 990 F.3d 1355, 1360-61, 1363 (Fed. Cir. 2021), that in addition to the five elements of the agency's case set forth above, the agency must also "justify the institution of a PIP" by proving by "substantial evidence that the employee's unacceptable performance 'continued'—i.e., it was unacceptable before the PIP." The Federal Circuit's decision in *Santos* applies to all pending cases, including this one, regardless of when the events took place. *Lee v. Department of Veterans Affairs*, 2022 MSPB 11, ¶ 16. However, given our disposition, we need not remand for adjudication of the element described in *Santos*.

successful, fully successful, excellent, and outstanding performance. ID at 3-4; IAF, Tab 19 at 47-57. However, the plan only defined fully successful performance for each critical element; it did not define minimally successful performance that would have allowed the appellant to avoid removal under chapter 43. ID at 8; IAF, Tab 19 at 47-57. Therefore, the administrative judge found that the standards provided in the appellant's performance plan were facially invalid. ID at 8-9.

¶9      On review, the agency disagrees that the performance standards provided in the appellant's performance plan were facially invalid. PFR File, Tab 1 at 7-9. According to the agency, it only needed to define fully successful performance. *Id.* at 7-8 (citing, e.g., 5 C.F.R. §§ 430.206(b)(8)(i)(B), 430.208(d)(1)). This argument misses the mark.

¶10     Although the regulations and guidance the agency cites only require that its performance plan establish the standard for "fully successful" performance, an agency's obligations do not necessarily end there if it wishes to pursue removal under the chapter 43 statutory scheme. *Compare* 5 C.F.R. § 430.206(b)(8)(i)(B) (requiring that a performance plan establish fully successful performance), *with Sherrell v. Department of the Air Force*, 47 M.S.P.R. 534, 539 (1991) (recognizing this requirement in a prior version of the regulation, but also that an agency's performance standards are invalid if they require projection of more than one level to determine a specific level of performance), *aff'd*, 956 F.2d 1174 (Fed. Cir. 1992) (Table). Performance standards "must set forth in objective terms the minimum level of performance which an employee must achieve to avoid, inter alia, removal for 'unacceptable performance'" under chapter 43. *Eibel v. Department of the Navy*, 857 F.2d 1439, 1441 (Fed. Cir. 1988). A single standard in a five-tier performance plan violates the statutory requirement of objectivity because it requires extrapolation more than one level above and below the written standard, rendering the standard facially invalid. *Henderson v. National Aeronautics and Space Administration*, 116 M.S.P.R. 96, ¶ 13 (2011).

Accordingly, the standards in the appellant's performance plan, which defined fully successful performance but not minimally successful performance, were not valid for purposes of this removal action.

> *The performance standards in the appellant's PIRM, or PIP notice, were also invalid.*

¶11 While the appellant's performance plan did not suffice for meeting the agency's burden of proving that its performance standards were valid under 5 U.S.C. § 4302, our analysis does not stop there. Facially invalid standards such as the ones at issue in this appeal may be cured through subsequent communications to the employee. *Henderson*, 116 M.S.P.R. 96, ¶ 13. An agency may cure otherwise fatal defects in the development and communication of performance standards by communicating sufficient information regarding performance requirements at the beginning of, and even during, the PIP. *Id.*, ¶ 18. However, at whatever point in the process they are communicated, standards that fail to inform an employee of what is necessary to obtain an acceptable level of performance and instead describe what she should not do are invalid backwards standards. *Van Prichard v. Department of Defense*, 117 M.S.P.R. 88, ¶ 18 (2011), *aff'd per curiam*, 484 F. App'x 489 (Fed. Cir. 2012); *see Eibel*, 857 F.2d at 1441-42 (finding that invalid backwards standards read more like unacceptable standards, rather than acceptable ones, and literally can be met by doing nothing); *Henderson*, 116 M.S.P.R. 96, ¶ 12 n.3 (explaining that backwards standards are ones that identify unacceptable performance, rather than acceptable performance).

¶12 The administrative judge noted that the PIRM, or PIP notice, did elaborate on the deficient performance plan by providing a definition of minimally successful performance for each standard underlying the three critical elements at issue in this removal action. ID at 9-10; IAF, Tab 19 at 35, 39-43. The administrative judge discussed just the first critical element, "planning of and

preparation for assigned investigations," but explained that the measures were similar for the others. ID at 9-10.

¶13   For each of the critical elements at issue in this appeal, including the first, the appellant's performance was measured by four criteria: quality, supervision needed/independence, timeliness, and quantity. IAF, Tab 19 at 39-40. However, for the "quality" criterion under that critical element, the PIRM provided that "[a] rating of minimally successful means that . . . components of assignment investigations were of less than good quality." *Id.* at 39. The "supervision" criterion described minimally successful performance as that which included "more than normal discussion with the [SAIC]." *Id.* The "quantity" criterion described minimally successful performance as "a less than expected quantity of planning and preparation activities . . . completed within the time frames set forth." *Id.* at 40.

¶14   Using the "quantity" criterion as an example, the administrative judge found that it described unacceptable performance, rather than minimally acceptable performance, because its requirement that the appellant produce "a less than expected quantity" could be satisfied by producing nothing at all. ID at 10. The administrative judge determined that each of these criteria were backwards standards, and they were therefore invalid. ID at 10-12; *see Eibel*, 857 F.2d at 1441-42; *Van Prichard*, 117 M.S.P.R. 88, ¶ 18; *Henderson*, 116 M.S.P.R. 96, ¶ 12 n.3.

¶15   The final criterion under each critical element, timeliness, was notably different than the others. Again, using the first critical element as an example, the PIRM indicated that minimally successful performance meant that "generally assigned investigative plans are completed on schedule within the first 15-30 days of the assignment; however, occasional delays that do not adversely affect Agency operations or schedules in submitting non-complex assignments are acceptable." IAF, Tab 19 at 40. The administrative judge found that the agency's timeliness criteria were not backwards on their face, but they were nevertheless

invalid because they were inextricably intertwined with the other three backwards standards included in each critical element. ID at 11-12. She explained that the Acting SAIC who oversaw the appellant's PIP and proposed her removal confirmed that he did not consider the appellant's work timely if it was lacking in quality or required excessive supervision. *Id.*

¶16    On review, the agency argues that the administrative judge erred by finding its quality, supervision needed, and quantity standards to be backwards. PFR File, Tab 1 at 10. The agency contends that the administrative judge improperly considered isolated phrases in the PIRM rather than viewing the phrases in context. *Id.* We disagree.

¶17    The appellant's performance plan and her PIRM do not explain what was necessary for the appellant to be rated minimally successful and avoid the removal action before us. IAF, Tab 19 at 35-58. Once again, we will use the first critical element and the underlying "quantity" criterion as an example. The performance plan describes the first critical element, and it describes the underlying "quantity" criterion, but the performance plan only defines fully successful performance for the same. *Id.* at 49. Specifically, the performance plan provides as follows:

> A rating of *fully successful means that the expected quantity of planning and preparation activities is completed* within the time frames set forth in the [Office of Investigation's] performance measures. The complexity and priority of cases are considered in determining what quantity of work is expected. Generally, the planning and preparation activities are completed upon assignment of an investigation with a normal level of discussion with the Special Agent in Charge or Task Leader. Note that for this grade level a minimal level of assistance from the Special Agent in Charge or Task Leader and monthly status checks are expected.

*Id.* (emphasis added).

¶18      The PIRM contains the same description for the first critical element and the same description for the underlying "quantity" criterion, but the PIRM then provides:

> A rating of *minimally successful means that a less than expected quantity of planning and preparation activities is completed* within the time frames set forth in the [Office of Investigation's] performance measures. The complexity and priority of cases are considered in determining what quantity of work is expected. Generally, the planning and preparation activities are completed upon assignment of an investigation with more than normal discussion with the Special Agent in Charge or Task leader. Note that for this grade level a minimal level of assistance from the Special Agent in Charge or Task leader and monthly status checks are expected.

*Id.* at 40 (emphasis added).

¶19      Although the agency argues that the additional context shows that its performance standards were valid, we find that the additional context only illuminates the agency's error. Read together, the performance plan provides that a fully successful rating requires "the expected quantity," while the PIRM provides that a minimally successful rating requires "a less than expected quantity." *Id.* at 40, 49. However, there is no other difference between the ratings described in those two documents, and neither differentiates between minimally successful and unacceptable performance. In other words, the agency failed to give the appellant an indication of how much "less than expected" she could produce in terms of quantity while still avoiding an unacceptable rating that would lead to her removal.

¶20     With its argument on review, the agency uses a different example—the third critical element, which is "preparation of reports of investigation and assists to staff closure memoranda." PFR File, Tab 1 at 11-12; IAF, Tab 19 at 42. In particular, the agency recounts the "quality" criterion, for which the PIRM provided as follows:

> A rating of minimally successful means that closure documents are of a less than expected quality in terms of being accurate, clear, organized, concise, and grammatically correct. The written product adequately supports and leads to logical conclusions and effectively communicates the intended information. It complies with Investigative Procedures Manual and Investigative Guidance Memoranda report writing requirements.

PFR File, Tab 1 at 11-12; IAF, Tab 19 at 42. The agency suggests that the latter phrases cure or at least improve on the "less than expected" language, which is more subjective. PFR File, Tab 1 at 12-13. But this argument seems to overlook the fact that the latter phrases are also contained, verbatim, in the performance plan's explanation of fully successful performance. The only difference between the agency's explanation of its performance standards for this metric is that "fully successful means that generally the closure documents are accurate, clear, organized, concise, and grammatically correct," IAF, Tab 19 at 2, while "minimally successful means closure documents are of a less than expected quality in terms of being accurate, clear, organized, concise, and grammatically correct," *id.* at 42.

¶21     The agency's standards for minimally successful performance are indistinguishable from comparable standards that we have found to be impermissibly backwards and invalid. For example, in *Van Prichard*, the Board considered the following language to describe marginal performance, i.e., the minimal level of performance needed in that case to avoid removal under chapter 43: "less than Fully Successful and supervisory guidance and assistance is more than normally required." *Van Prichard*, 117 M.S.P.R. 88, ¶ 17. The Board explained that although the standard in that case was written at the

"minimally successful" level, it was backwards and invalid because the standard failed to inform the employee of what was necessary to obtain an acceptable level of performance. *Id.*, ¶ 18. As a practical matter, the agency in *Van Prichard* failed to distinguish between minimally successful and unacceptable performance. *Id.* The same is true of the agency's performance standards in this case.

¶22   The agency separately argues that although language such as "less than expected" is somewhat subjective, that was permissible because of the nature of the appellant's work. PFR File, Tab 1 at 13. We disagree. The fact that the performance standard may call for a certain amount of subjective judgment on the part of the employee's supervisor does not automatically invalidate it. *Henderson*, 116 M.S.P.R. 96, ¶ 23. However, the performance standards must be sufficiently precise and specific as to invoke a general consensus as to its meaning and content and provide a firm benchmark toward which the employee may aim her performance. *Id.* Here, the agency's explanation of minimally successful performance fails to do so. The agency did not give the appellant any indication, for example, how much "less than good" her quality could be or "less than expected" her quantity could be while still avoiding unacceptable performance that would lead to her removal.

¶23   Next, the agency argues about the timeliness standards. PFR File, Tab 1 at 14. Once again, the administrative judge did not find the timeliness standards backwards on their face, but she found them inextricably intertwined with other standards that were. *Supra* ¶ 15. The agency contends that there is no requirement that performance standards be entirely discrete or independent from one another. PFR File, Tab 1 at 15-16 (referencing, e.g., *Mendez v. Department of the Air Force*, 62 M.S.P.R. 579 (1994), *overruled on other grounds by Jackson v. Department of Veterans Affairs*, 97 M.S.P.R. 13 (2004)). But the administrative judge did not find the timeliness standard invalid because it was related to the other standards; she found it invalid because the Acting SAIC acknowledged that he did not consider the appellant's work timely if it was

lacking as to the backwards standards, such as those concerning quality and supervision required. ID at 11. The agency has not presented any persuasive argument to the contrary, and it has not shown that the administrative judge erred by finding the timeliness standards invalid as a result.

*The agency has not shown that it cured its invalid performance standards.*

¶24    The agency's final assertion about the validity of its performance standards is that any deficiencies were cured during the PIP. PFR File, Tab 1 at 16-21. This argument is twofold. First, the agency contends that precedent from the Board and the U.S. Court of Appeals for the Federal Circuit demonstrates that its invalid standards could be cured rather than entirely rewritten. *Id.* at 16-19. Second, the agency contends that the standards at issue in this appeal were sufficiently cured during the PIP. *Id.* at 19-21.

¶25    As stated above, the Board has recognized that an agency may cure otherwise fatal defects in the development and communication of performance standards by communicating sufficient information regarding performance requirements at the beginning of, and even during, the PIP. *Henderson*, 116 M.S.P.R. 96, ¶ 18. However, *Henderson* and many other cases like it involved standards that were invalid for reasons different than the agency's backwards standards in this appeal. *E.g., id.*, ¶¶ 16-21 (considering whether the agency cured performance standards that included five possible ratings and set forth what was required to meet expectations, but failed to set forth what was required to meet the lower rating that would still preclude removal); *Thompson v. Department of the Army*, 89 M.S.P.R. 188, ¶¶ 18-19 (2001) (considering whether the agency cured performance standards that were absolute, i.e., a single performance error warranted an unacceptable rating).

¶26    In *Eibel*, our reviewing court considered backwards standards such as the ones currently before us. *Eibel*, 857 F.2d at 1441-42. The court explained that the backwards standards in *Eibel* were not the kind that "inherently require a degree of subjective judgment by the supervisor [and] may be 'fleshed out' and

'clarified' during counseling." *Id.* at 1443. Instead, the court explained that the backwards standards in that appeal "would have to be totally rewritten, not supplemented." *Id.* In several subsequent cases, the Board cited *Eibel* and similarly found that agencies' backwards performance standards would have to be entirely rewritten, not just fleshed out. *Jackson-Francis*, 103 M.S.P.R. 183, ¶ 10; *Burnett v. Department of Health and Human Services*, 51 M.S.P.R. 615, 617-18 (1991); *Ortiz v. Department of Justice*, 46 M.S.P.R. 692, 695 (1991). Although the Board has entertained the idea of an invalid backwards standard being cured, we found no example of an agency doing so.[3] *Van Prichard*, 117 M.S.P.R. 88, ¶ 18 (finding that the agency's standards were backwards and indicating that the agency did not identify anything in the record that cured the deficiency); *Ortiz*, 46 M.S.P.R. at 696 (finding that, to the extent the agency could have clarified its backwards standards, it failed to do so).

¶27 Turning back to the facts of this appeal, we find no basis for concluding that the agency's backwards performance standards, which needed more than simple fleshing out, were entirely rewritten or otherwise cured. While arguing to the contrary, the agency has once again relied on the language of the PIRM, asserting that it provided sufficient content to cure any defect. PFR File, Tab 1 at 16-17, 19 (referencing IAF, Tab 19 at 35-46). But, for the reasons discussed above, we disagree. The PIRM provided numerous examples of the appellant's unacceptable performance, IAF, Tab 19 at 36-38, and then provided backwards standards for minimally successful performance, *id.* at 39-43. We recognize that the PIRM went on to describe examples of the appellant's "typical duties and the activities

---

[3] The agency has cited three nonprecedential cases—two from the Federal Circuit and one from a district court—to assert that backwards performance standards can be cured without being rewritten. PFR File, Tab 1 at 19. However, two of those cases involved standards that were not backwards, *Thompson v. Department of the Navy*, 84 F. App'x 61, 63-64 (Fed. Cir. 2003); *Gallegos v. White*, No. CIV-O3-384, 2004 WL 7337514, at *5 (D.N.M. Oct. 6, 2004), and the third involved a two-paragraph opinion upholding an employee's chapter 43 removal without detailing the performance standards at issue, except to describe them as "poorly written" and "partially backward," but understood by the parties, *Sesko v. Department of the Navy*, 878 F.2d 1444 (Fed. Cir. 1989) (Table).

necessary to demonstrate minimally successful performance." *Id.* at 43-45. However, those examples are little more than a list of duties. While testifying, the Acting SAIC simply described them as the tasks in the appellant's workload. IAF, Tab 38, Hearing Recording, Day 1, Part 2 at 28:00-30:00 (testimony of Acting SAIC). They do not "set forth in objective terms the minimum level of performance which an employee must achieve" regarding the agency's quality, supervision needed, and quantity standards for the relevant critical elements. *See Eibel*, 857 F.2d at 1441.

¶28    The agency has also referenced communications during the PIP between the appellant and the Acting SAIC. PFR File, Tab 1 at 17, 20-21 (referencing, e.g., IAF, Tab 19 at 12-33). It highlighted two notations, in particular. The first was the Acting SAIC's handwritten comment in the margin of a document the appellant produced, where he stated, "We need to show what process [subject] used with his records and clearly and concisely identify a sub[stantiate] or no sub[stantiate] call. Again, if you have questions ask." PFR File, Tab 1 at 20 (referencing IAF, Tab 35 at 56). The second is a single comment within the Acting SAIC's record of meetings he had with the appellant during the PIP, in which he stated that "it is an expectation per your elements and standards defined under critical element 1 that you are able to identify and develop your own steps toward proper planning and preparation of your work to demonstrate that you are capable at the minimally successful level." PFR File, Tab 1 at 20 (referencing IAF, Tab 19 at 22). Although the evidence cited shows that the agency continuously warned the appellant that her performance was unacceptable and provided some limited instruction for improvement during the PIP, it does not rewrite or otherwise cure the agency's backwards performance standards. Because the agency has failed to establish any basis for us to overturn the administrative judge's decision and find that the agency proved the validity of its performance standards, we need not consider the parties' competing arguments

about the remainder of the agency's burden. PFR File, Tab 1 at 22-28, Tab 3 at 3-21, Tab 5 at 5-13.

The appellant did not prove her affirmative defenses.

¶29 The administrative judge considered, but rejected, the appellant's claims of a due process violation, ID at 5-7, discrimination based on race, sex, and national origin, along with associated EEO reprisal, ID at 12-21, and disability discrimination, ID at 22-26. In her cross petition for review, the appellant reasserts only her claims of race discrimination, sex discrimination, and EEO reprisal. PFR File, Tab 3 at 21-24.

¶30 Concerning the Title VII discrimination and EEO reprisal claims that the appellant reasserts on review, the administrative judge identified and applied the standard set forth in *Savage v. Department of the Army*, 122 M.S.P.R. 612 ¶¶ 41-42, 51 (2015), *as clarified by Gardner v. Department of Veterans Affairs*, 123 M.S.P.R. 647 (2016). ID at 15-17. Under that standard, when an appellant asserted an affirmative defense of discrimination or retaliation under 42 U.S.C. § 2000e-16, the Board would first inquire whether she had shown by preponderant evidence that the prohibited consideration was a motivating factor in the contested personnel action. *Savage*, 122 M.S.P.R. 612, ¶ 51. Such a showing was sufficient to establish that the agency violated 42 U.S.C. § 2000e-16, thereby committing a prohibited personnel practice under 5 U.S.C. § 2302(b)(1). *Id.* If the appellant met her burden, the Board then would inquire whether the agency had shown by preponderant evidence that the action was not based on the prohibited personnel practice, i.e., it still would have taken the contested action absent the alleged discriminatory or retaliatory motive. *Id.* If the Board found that the agency made that showing, its violation of 42 U.S.C. § 2000e-16 would not require reversing the action. *Id.* Ultimately, the administrative judge found that the appellant failed to meet her initial burden of proving that any characteristic or activity protected under Title VII was a motivating factor in the agency's removal action. ID at 12-21.

¶31 Following the issuance of the initial decision in this case, the Board issued *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶¶ 20-25, 30, which overruled parts of *Savage* and clarified the proper analytical framework to be applied to affirmative defenses of Title VII discrimination and retaliation. Specifically, the Board explained in *Pridgen* that for status-based discrimination claims, in order to obtain full relief, the appellant must show that discrimination or retaliation was the "but-for" cause of the personnel action. *Pridgen*, 2022 MSPB 31, ¶¶ 21-22, 30. The Board also clarified the expansive scope of potentially relevant evidence. *Id.*, ¶¶ 23-25.

¶32 Based on our review of the record, we conclude that the outcome of this appeal under the standard set forth in *Pridgen* would be the same as that arrived at by the administrative judge. On review, the appellant suggests that she met her initial burden by simply establishing that the officials involved in her removal had knowledge of her protected EEO activity. PFR File, Tab 3 at 21-22. We disagree. In making this argument, the appellant seems to conflate the standards for an EEO reprisal claim with the standards for a whistleblower reprisal claim. *Compare Pridgen*, 2022 MSPB 31, ¶¶ 20-25, 30 (explaining that claims of retaliation for opposing discrimination in violation of Title VII are analyzed under the same framework as used for Title VII discrimination claims), *with Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, ¶¶ 12, 18 (2015) (describing how an appellant may establish a prima facie case of whistleblower reprisal by simply proving that the official taking the personnel action had knowledge of the employee's protected disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action).

¶33 Aside from her mistaken reliance on an inapplicable standard, the only arguments the appellant presents about her Title VII discrimination and reprisal claims are brief ones recounting and recharacterizing hearing testimony. PFR File, Tab 3 at 22-24. This primarily concerns testimony about whether certain

management officials treated subordinates differently based on characteristics such as race. *Id.* The appellant has not identified any other evidence in support of her disagreement with the administrative judge. *See* 5 C.F.R. § 1201.115(a)(2) (requiring that a petitioner explain why a challenged factual determination is incorrect and identify specific evidence demonstrating the error).

¶34 Accordingly, after reviewing the record, we find that the appellant has presented no basis for us to reach a conclusion different than the administrative judge as to her Title VII discrimination and reprisal claims.[4] We therefore agree with the administrative judge that the agency failed to meet its burden of proving the validity of the appellant's performance standards and the appellant failed to prove any of her affirmative defenses.

## ORDER

¶35 We ORDER the agency to cancel the removal and to retroactively restore the appellant effective October 19, 2018. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

¶36 We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this

---

[4] As previously mentioned, the appellant did not reassert her disability discrimination claim on review. However, we make the following observations about the claim and recent case precedent. The administrative judge indicated that the appellant had the initial burden of proving by preponderant evidence that her disability was a motivating factor in the removal action and, if she met that burden, the burden would shift to the agency to prove by clear and convincing evidence that it would have taken the same action in the absence of the improper motive. ID at 22-23 (citing, e.g., *Southerland v. Department of Defense*, 119 M.S.P.R. 566, ¶ 23 (2013)). However, the Board in *Pridgen*, 2022 MSPB 31, ¶¶ 20-25, 42, clarified that the standards and methods of proof applicable to Title VII claims are also applicable to status-based disability discrimination claims. Nevertheless, the administrative judge provided well-reasoned findings as to why the appellant failed to prove that her disability was a motivating factor in the removal action, and the appellant has not reasserted the matter on review. Therefore, the administrative judge's mistaken application of *Southerland* is of no consequence, and we need not reach the question of "but-for" causation.

decision. We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

¶37 We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order. The appellant, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

¶38 No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

¶39 For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶40 This is the final decision of the Merit Systems Protection Board in this appeal. Title 5 of the Code of Federal Regulations, section 1201.113 (5 C.F.R. § 1201.113).

## NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set out at Title 5 of the United States Code (U.S.C.), sections 7701(g), 1221(g), 1214(g) or 3330c(b); or 38 U.S.C. § 4324(c)(4). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your attorney fees motion with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[5]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

---

[5] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

(1) **<u>Judicial review in general</u>**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **<u>Judicial or EEOC review of cases involving a claim of discrimination</u>**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you</u>

<u>receive</u> this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[6]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

---

[6] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

*Gina K. Grippando*

Gina K. Grippando
Clerk of the Board
Washington, D.C.

**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE:  Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐   1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐   2) Settlement agreement, administrative determination, arbitrator award, or order.

☐   3) Signed and completed "Employee Statement Relative to Back Pay".

☐   4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐   5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐   6) All relevant benefit election forms (e.g., TSP, FEHB, etc.).

☐   7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.   Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).

# NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1.  Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2.  The following information must be included on AD-343 for Restoration:

    a.  Employee name and social security number.
    b.  Detailed explanation of request.
    c.  Valid agency accounting.
    d.  Authorized signature (Table 63).
    e.  If interest is to be included.
    f.  Check mailing address.
    g.  Indicate if case is prior to conversion.  Computations must be attached.
    h.  Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1.  Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2.  Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3.  Outside earnings documentation statement from agency.
4.  If employee received retirement annuity or unemployment, provide amount and address to return monies.
5.  Provide forms for FEGLI, FEHBA, or TSP deductions (if applicable).
6.  If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7.  If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

    a.  Must provide same data as in 2, a-g above.
    b.  Prior to conversion computation must be provided.
    c.  Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.