**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| RONALD WIESNER, | DOCKET NUMBER |
| Appellant, | DA-0432-25-0118-I-1 |
| v. | |
| DEPARTMENT OF HOMELAND SECURITY, | DATE:  June 8, 2026 |
| Agency. | |

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Amanda J. Moreno, Esquire, Houston, Texas, for the appellant.

Jennifer N. Milan, Esquire, and Thomas A. Behe, Esquire, Houston, Texas, for the agency.

**BEFORE**

Henry J. Kerner, Vice Chairman
James J. Woodruff II, Member

**FINAL ORDER**

The appellant has filed a petition for review of the initial decision, which affirmed his removal for unacceptable performance under 5 U.S.C. chapter 43. For the reasons discussed below, we GRANT the appellant's petition for review, REVERSE the initial decision's findings concerning the removal action, AFFIRM

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

the initial decision's findings regarding the discrimination affirmative defense, and ORDER the agency to reinstate the appellant to his former position.

## BACKGROUND

The appellant began working for the agency as a GS-13 Investigative Program Specialist (Polygraph Examiner) in or around October 2020. Initial Appeal File (IAF), Tab 9 at 4. His job duties included completing polygraph examinations of applicants for Customs and Border Protection law enforcement positions. IAF, Tab 34 at 16. The potential results of a polygraph examination are no significant response (NSR), significant response (SR), no opinion-countermeasures (NO-CM), and no opinion (NO). *Id.* at 19. NSR is a passed polygraph and SR is a failed polygraph. *Id.* According to the appellant's supervisor, a NO-CM result is when there is atypical physiology consistent with an attempt to manipulate polygraph data. *Id.* A NO opinion is when the data does not support a NSR, SR, or NO-CM decision. *Id.* NSR, SR, and NO-CM are conclusive results and NO is inconclusive. *Id.* at 20. According to the appellant's supervisor, NO opinions typically require a retest but there are other reasons besides NO opinions that can trigger a retest. *Id.*

The appellant received successful performance ratings for fiscal years 2021-2023. IAF, Tab 22 at 8-13. On March 4, 2024, the appellant's supervisor sent an email identifying deficiencies in the appellant's performance. IAF, Tab 5 at 99-101. In relevant part, he asserted that the appellant's NO rate was 30%, more than double the national average and 12 points higher than the Team Central Texas average of 18%. *Id.* at 101. On June 11, 2024, the agency notified the appellant that he was being placed on an Employee Proficiency Plan (EPP) because he was deficient in the core competency area of "professionalism." *Id.* at 86-91. The EPP described the appellant's deficient performance in the following areas: (1) he failed to timely submit cases within agency guidelines on no less than six occasions; (2) the length of his post-test interview for applicants

was unnecessarily prolonged on three occasions; and (3) his NO rate of 26% exceeded the 18% average rate of the CAD [Credibility Assessment Division] and Team Central Texas over the past 9 months. *Id.* at 89-90. The improvement period was to run from July 15 through August 13, 2024, but was extended through September 4, 2024, based on the appellant's use of sick leave during the EPP period. *Id.* at 39, 90.

During the EPP, the appellant's supervisor and other managers repeatedly requested that the appellant conference in a supervisor to his polygraph examinations for guidance and observation. *Id.* at 44-48, 53-66. The appellant did not comply with these requests, stating on at least one occasion that the EPP was retaliatory.[2] *Id.* at 46. On September 20, 2024, the appellant's supervisor proposed his removal from Federal service for unacceptable performance. *Id.* at 27-31. The proposal stated that, at the completion of the EPP period, his NO rate remained at 25%, which was 8% above the average rates of Team Central Texas and CAD. *Id.* at 28. The proposal stated that the areas of timely submission of assessments and conducting appropriate length post-tests, i.e., subelements 1 and 2 of the EPP, were "not able to be addressed appropriately" during the performance period. *Id.*

The appellant did not reply to the proposed removal. *Id.* at 22. The agency sustained the proposal, and the appellant's removal was effective November 22, 2024. *Id.* at 24-26; IAF, Tab 9 at 4. This appeal followed. IAF, Tab 1. The administrative judge issued an initial decision on the written record. IAF, Tab 36, Initial Decision (ID). She concluded that the agency met each element of its chapter 43 case by substantial evidence and that the appellant failed to prove his affirmative defense of disability discrimination. The appellant has filed a petition for review, and the agency has filed a response. Petition for Review (PFR) File, Tabs 4, 6. On review, the appellant reasserts the same arguments that

---

[2] The appellant did not explicitly raise a reprisal affirmative defense before the administrative judge or on review.

he raised before the administrative judge and states that the agency failed to prove its case by substantial evidence. PFR File, Tab 4 at 9-31.

## DISCUSSION OF ARGUMENTS ON REVIEW

An agency may remove an employee for unacceptable performance under 5 U.S.C. § 4303 when it proves the following by substantial evidence: (1) the Office of Personnel Management approved the agency's performance appraisal system and any significant changes thereto; (2) the agency communicated to the appellant the performance standards and critical elements of his position; (3) the appellant's performance standards are valid under 5 U.S.C. § 4302(c)(1); (4) the appellant's performance during the appraisal period was unacceptable in one or more critical elements; (5) the agency warned the appellant of the inadequacies of his performance during the appraisal period and gave him an adequate opportunity to demonstrate acceptable performance; and (6) after an adequate improvement period, the appellant's performance remained unacceptable in one or more of the critical elements. *Lee v. Department of Veterans Affairs*, 2022 MSPB 11, ¶ 15. We disagree with the administrative judge's finding that the agency proved its performance standards are valid, ID at 6-8, as discussed below. We therefore reverse the appellant's removal.

Performance standards must, to the maximum extent feasible, permit the accurate appraisal of performance based on objective criteria. 5 U.S.C. § 4302(c)(1); *Guillebeau v. Department of the Navy*, 362 F.3d 1329, 1335-36 (Fed. Cir. 2004). Standards must be specific enough to provide an employee with a firm benchmark toward which to aim his performance and must be sufficiently precise to invoke general consensus as to their meaning and content. *Zepeda v. Nuclear Regulatory Commission*, 2024 MSPB 14, ¶ 22. Facially invalid standards may be cured through subsequent communications to the employee. *Zepeda*, 2024 MSPB 14, ¶ 11; *Dancy v. Department of the Navy*, 55 M.S.P.R. 331, 335 (1992). Performance standards are not valid, however, if they do not set forth the

minimum level of performance that an employee must achieve to avoid removal for unacceptable performance under chapter 43. *Jackson-Francis v. Office of Government Ethics*, 103 M.S.P.R. 183, ¶ 8 (2006).

In this case, the agency's performance appraisal system has two levels—successful and unacceptable. IAF, Tab 22 at 8-13. The performance plan explains that expectations are met in the critical element of professionalism as follows:

> Effective application of job knowledge and technical skills. Examples include written and oral communications, leadership, planning and organization, analytical skills and problem solving. Performs duties in a professional manner, interacting with fellow workers and members of the public in a courteous and respectful manner even in the face of provocation or adversity.

IAF, Tab 5 at 115, Tab 22 at 12. The general standard is supplemented by the fiscal year (FY) 2024 Performance Plan Guide. IAF, Tab 5 at 148-51. That document contains numerous metrics to be considered in evaluating performance. For example, a "general . . . expectation[]" of a polygraph examiner is to test 150 applicants or approximately 177 exams per year with a retest rate of approximately 20% or less. *Id.* at 148. A polygraph examiner "exceed[s] expectations" by testing 165 applicants or approximately 192 exams per year with a retest rate of approximately 20% or less.[3] *Id.* The guide also provides metrics for non-concur rates, administrative returns, and elicitation of reportable information. *Id.* at 151. Each category has four statistical levels, which translate to excellent, satisfactory, improvement needed, and unsatisfactory performance. *Id.* The guide suggests that a polygraph examiner must receive a satisfactory or above in non-concur rates and reportable information rates to receive a successful performance rating. *Id.* at 148. The guide does not explain the difference between improvement needed and unsatisfactory and how those categories

---

[3] Although the performance plan guide contains different metrics under "expectations" and "exceeding expectations," the performance appraisal system has only two levels, successful and unacceptable. IAF, Tab 5 at 115, 148.

translate to the successful and unacceptable performance levels. Most relevant to this appeal, the guide states that a polygraph examiner must have "high conclusive call examination rates." *Id.* "High conclusive call examination rates" is not defined or quantified in the document. *Id.* at 148-51. The agency acknowledges as much. However, it asserts that its communications to the appellant throughout the EPP period clarify the standard. IAF, Tab 34 at 20; *see Zepeda*, 2024 MSPB 14, ¶ 11.

On March 4, 2024, the appellant's supervisor sent the appellant an email stating the following: "As of March 4, 2024, your no opinion rate for FY 24 is 30%. This is more than double the CAD national average of 14% and 12% higher than our team average of 18%." IAF, Tab 5 at 101. The August 2024 EPP stated that, to achieve acceptable performance criteria in the core competency area of professionalism, the appellant was required to have "minimal NO results." *Id.* at 35. The document stated that the appellant's NO rate of 26% "exceeds the 18% average rate of CAD and Team Central Texas over the past nine months." *Id.* at 35-36. It furthered stated, "No opinion results can happen but a no opinion rate of 26% over the last nine months is excessive." *Id.* at 35.

Considering all of the evidence, we conclude that the agency did not prove that its performance standard, as it relates to the NO rate, is valid. Although the agency appears to assert that the appellant was required to meet the average NO rate for CAD and/or Team Central Texas, those two rates can differ, as evidenced by the agency's communications. *E.g.*, IAF, Tab 5 at 101. Further, the appellant's supervisor attested that the appellant's average NO rate changed daily based on the number of polygraphs that he conducted. IAF, Tab 34 at 21. By implication, the Team Central Texas and the CAD national average, also changed daily. Throughout the course of the EPP and this litigation, the agency identified various NO rates that the appellant was expected to adhere to. IAF, Tab 5 at 28 (stating, in the September 2024 proposed removal, that the average NO rate for CAD and Team Central Texas was 17%), 35-36 (stating, in the July 2024 EPP,

that the NO rate for CAD and Team Central Texas was 18% for the preceding 9 months), 101 (stating, in March 2024, that the CAD national NO rate was 14% and the Team Central Texas rate was 18%); Tab 34 at 41 (stating that the CAD national NO rate was 16-18%), 52 (suggesting that the NO rate cannot exceed 20%), 55 (stating that the CAD NO rate was 16-18%).

The agency also has not explained whether the appellant was required to meet the average, fall below it, or something else. The appellant's supervisor stated in a declaration that polygraph examiners must "maintain the average of the Texas team of Polygraph Examiners." IAF, Tab 34 at 20. The Director of CAD explained in a declaration that "we expect examiners to be very close to the overall average." *Id.* at 41. "Very close" is not defined. *See Cranwill v. Department of Veterans Affairs*, 52 M.S.P.R. 610, 616 (1992) (explaining that the agency must provide a firm benchmark, not an elusive goal that the agency may find the employee met or failed to meet at its pleasure). We have further considered the appellant's assertion that some NO results are out of his control, PFR File, Tab 4 at 13, 25, which is corroborated by the CAD Director, IAF, Tab 34 at 41 ("a high No Opinion rate does not always reflect poor performance").

The agency's reliance on a different metric, the retest rate, to clarify the NO rate does not require a different result. Regarding the retest rate, the agency's performance plan requires, to achieve successful performance, that a polygraph examiner have a retest rate of "approximately 20% or less." IAF, Tab 5 at 148. To the extent the agency suggests that the retest rate and the NO rate are "synonymous," and the appellant was therefore required to have an NO rate under 20%, IAF, Tab 34 at 52, that adds yet another level of uncertainty to interpreting the NO rate. To the extent the agency suggests that the appellant's retest rate exceeded 20% and is therefore an independent basis for removal under chapter 43, neither the EPP nor the proposed removal state as much. IAF, Tab 5 at 27-37; *see* 5 U.S.C. § 4303(b)(1)(A)(i) (stating that an employee is entitled to

30 days' advance written notice of the proposed action which identifies specific instances of unacceptable performance). For these reasons, we find that the retest rate is of little value in determining whether the agency provided a firm benchmark toward which the appellant could aim his performance regarding his NO rate.

The agency controlled how it drafted the EPP and notice of proposed removal. The evidence it submitted was confusing and, at times, conflicting. We therefore conclude that it failed to prove by substantial evidence the validity of its performance standard as it relates to the NO rate. Because we find that the agency's performance standards are not valid, we cannot evaluate whether the agency properly took action against the appellant for unacceptable performance.[4,5] *Neal v. Defense Logistics Agency*, 72 M.S.P.R. 158, 161 (1996). We therefore reverse the appellant's removal.

## ORDER

We ORDER the agency to cancel the appellant's removal and to restore him retroactive to November 22, 2024. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Back Pay Act and/or Postal Service regulations, as appropriate, no later than 60 calendar days after the date of this decision. We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out

---

[4] Because the agency did not make findings on subelements 1 and 2 identified in the EPP, IAF, Tab 5 at 27-29, we need not consider whether those performance measures are valid.

[5] The appellant's petition for review does not establish a basis to disturb the administrative judge's finding that he failed to prove his affirmative defense of disability discrimination, and we therefore affirm her findings. ID at 17-23.

the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and of the actions it has taken to carry out the Board's Order. The appellant, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision on this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

### NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set forth at title 5 of the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If

you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[6]

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court

---

[6] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file

with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[7]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

---

[7] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:          *Gina K. Grippando*
                        _____
                        Gina K. Grippando
                        Clerk of the Board

Washington, D.C.

**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805. Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete. Missing documentation may substantially delay the processing of a back pay award. **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE: Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐ 1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket. Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐ 2) Settlement agreement, administrative determination, arbitrator award, or order.

☐ 3) Signed and completed "Employee Statement Relative to Back Pay".

☐ 4) All required SF50s (new, corrected, or canceled). **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐ 5) Certified timecards/corrected timecards. **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐ 6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐ 7) Outside earnings documentation. Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment. Documentation includes W-2 or 1099 statements, payroll documents/records, etc. Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:** When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received. The payroll office must collect the debt from the back pay award. The annual leave will be restored to the employee. Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).

**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.
2. The following information must be included on AD-343 for Restoration:

   a. Employee name and social security number.
   b. Detailed explanation of request.
   c. Valid agency accounting.
   d. Authorized signature (Table 63).
   e. If interest is to be included.
   f. Check mailing address.
   g. Indicate if case is prior to conversion.  Computations must be attached.
   h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3. Outside earnings documentation statement from agency.
4. If employee received retirement annuity or unemployment, provide amount and address to return monies.
5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)
6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

   a. Must provide same data as in 2, a-g above.
   b. Prior to conversion computation must be provided.
   c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.